# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| EDDIE SANCHEZ (#K-50113), | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-4143 |
| v. | ) | |
| | ) | Judge Marvin E. Aspen |
| ROB JEFFREYS, et. al, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Eddie Sanchez, a former inmate of the Illinois Department of Corrections ("IDOC"), filed this action pursuant to 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act of 1990 ("ADA") alleging violations of his constitutional rights and seeking damages and injunctive relief. (*See* Second Amended Complaint (Dkt. No. 53).)[1] Defendant Wexford Health Sources, Inc. ("Wexford") now moves for summary judgment on Sanchez's Eighth Amendment deliberate indifference claim. (Defendant Wexford Health Sources, Inc.'s Motion for Summary Judgment (Dkt. No. 144); Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Summ. J. Mem.") (Dkt. No. 145).) Sanchez opposes Wexford's motion. (Plaintiff's Memorandum of Law in Response to Defendant's Motion for Summary Judgment ("Pl.'s Summ. J. Opp'n.") (Dkt. No. 151).) For the reasons that follow, we grant Wexford's motion for summary judgment.

---

[1] For ECF filings, we cite to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

## FACTUAL BACKGROUND

We take the following facts from the parties' Local Rule 56.1 submissions,[2] the materials cited therein, and other aspects of the record in this case. All facts are genuinely undisputed unless otherwise noted.

### A.      The Parties and Wexford's Policies and Procedures

Plaintiff Eddie Sanchez is a convicted felon and a former inmate of IDOC. (Pl.'s Resp. to Def.'s SOF ¶ 1.) While detained and awaiting criminal trial in Cook County Jail, Sanchez was diagnosed with sleep apnea and issued a continuous positive airway pressure or "CPAP" machine. (Def.'s Resp. to Pl.'s SOAF ¶ 3.) Sleep apnea is a disorder that interrupts an individual's breathing during sleep. (*See* Wexford's Answer to Second Amended Complaint ("Answer") (Dkt. No. 67) ¶ 67.) A CPAP machine keeps an affected individual's airways open so that they can receive adequate oxygen. (*Id.* ¶ 70.) CPAP machines require durable medical equipment and supplies to function, including tubing, face masks, headgear, filters, and a water chamber. (Def.'s Resp. to Pl.'s SOAF ¶¶ 12–13.)

Defendant Wexford is a private correctional healthcare company that contracts with IDOC to provide healthcare services to inmates housed in IDOC prisons. (*Id.* ¶ 2.) Wexford does not have any guidelines, policies, procedures, or protocols (written or otherwise) for treating individuals with sleep apnea. (Pl.'s Resp. to Def.'s SOF ¶ 69.) Nor does it have any

---

[2] *See* Defendant Wexford Health Sources, Inc.'s Rule 56.1 Statement of Undisputed Facts in Support of its Motion for Summary Judgment ("Def.'s SOF") (Dkt. No. 146); Plaintiffs' Response to Defendant's Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("Pl.'s Resp. to Def.'s SOF") (Dkt. No. 152); Plaintiff's Statement of Additional Material Facts Pursuant to Local Rule 56.1(b)(3) ("Pl.'s SOAF") (Dkt. No. 153); Defendant's Response to Plaintiff's Local Rule 56.1(b)(3) Statement of Additional Facts ("Def.'s Resp. to Pl.'s SOAF") (Dkt. No. 164).

policies (written or otherwise) regarding the provision or replacement of CPAP equipment. (*Id.* ¶¶ 71–72.)[3] Although Wexford is not responsible for maintaining the conditions of confinement in IDOC facilities, it is responsible for providing inmates with durable medical equipment, such as replacement parts for a CPAP machines. (*Id.* ¶ 79; Def.'s Resp. to Pl.'s SOAF ¶ 12.)

The provision of medical care in IDOC facilities is governed by an administrative directive known colloquially as the "sick-call process." (Dkt. No. 146-20, Ex. 12 ("IDOC Administrative Directive 04.03.103").) "Sick call is the mechanism through which medical providers triage and treat inmates' medical complaints, as well as refer inmates to onsite or offsite medical providers when appropriate." *Lewis v. Pfister*, No. 1:18-CV-4502, 2023 WL 121768, at *2 (N.D. Ill. Jan. 6, 2023). The sick call directive requires healthcare service providers to conduct daily rounds and log inmate requests for health care services—including replacement durable medical equipment. (IDOC Administrative Directive 04.03.103 at 2–3.) Sick call requests are reviewed within 24 hours, and referrals are made if medically necessary. (*Id.* at 4.)

### B. Sanchez's Carceral History and Complaints of Deliberate Indifference

Sanchez entered IDOC facilities in May 2018. (Pl.'s Resp. to Def.'s SOF ¶ 5.) At the Northern Reception and Classification center, he signed a contract allowing him to bring his

---

[3] Sanchez attempts to disputes this fact by citing allegations in the Second Amended Complaint. (*See* Pl.'s Resp. to Def.'s SOF ¶¶ 71–72.) Allegations are not evidence. "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." N.D. Ill. R. 56.1(e)(3). "Asserted facts many be deemed admitted if not controverted with specific citations to evidentiary material." *Id.* Local Rule 56.1 is strictly enforced. *Williams v. Wexford Health Sources, Inc.*, No. 1:17-CV-06121, 2022 WL 4132443, at *6 (N.D. Ill. Sept. 12, 2022). For the purposes of this memorandum opinion, we deem admitted Wexford's asserted facts with respect to the absence of policies regarding the provision or replacement CPAP equipment. We also deem admitted all other asserted facts that the parties fail to controvert with specific evidence.

CPAP machine into IDOC facilities and keep it his cell.  (*Id.*)  Sanchez was transferred to Stateville Correctional Center ("Stateville") in June 2018.  (*Id.* ¶ 6.)  He remained at Stateville until July 2019, when he was transferred to another IDOC facility, Hill Correctional Center ("Hill").  (*Id.* ¶ 7.)  In November 2019 he was transferred to a third IDOC facility, Danville Correctional Center ("Danville"), where he remained until he was paroled or released in 2020. (*Id.*)  Sanchez was allowed to take his CPAP machine with him each time he was transferred within the IDOC system.  (Def.'s Resp. to Pl.'s SOAF ¶ 16.)

Wexford and its employees were contractually tasked with providing health care to Sanchez and other inmates at each of the three IDOC facilities where Sanchez was housed. (Def.'s Resp. to Pl.'s SOAF ¶ 2.)  While all three facilities used the IDOC sick call process, the process for obtaining CPAP equipment and cleaning supplies varied slightly among the facilities. (Pl.'s Resp. to Def.'s SOF ¶ 10.)  For example, at Hill, soap to clean CPAP machines was not provided as part of the sick call process and was available for purchase on commissary.  (*Id.* ¶ 43.)  And while Hill and Danville used the sick call process for obtaining replacement durable medical equipment, at Stateville an IDOC employee was responsible for ordering supplies without Wexford's involvement.  (*See id. ¶* 30.)  Stateville provided receipts of CPAP supplies that were distributed to inmates through this process.  (*Id.* ¶ 65.)

Sanchez asserts that while he was in IDOC custody, Wexford failed to provide adequate replacement equipment or cleaning supplies for his CPAP machine.  (*See* Def.'s Resp. to Pl.'s SOAF ¶¶ 25–27.)  Beginning in December 2018, Sanchez filed a total of 13 formal grievances alleging that his CPAP machine had become dirty, contaminated, or infested with cockroaches and that Wexford and/or IDOC failed to provide him with replacement parts or cleaning supplies.  (*See* Def.'s Resp. to Pl.'s SOAF ¶ 30; *see generally* (Dkt. No. 148-1) ("Sanchez

Dep.").)  Sanchez claims that the unsanitary condition of his CPAP machine caused him to suffer sinus infections, ulcers, stomach disorders and anxiety issues.  (*Id.* ¶ 22; Sanchez Dep. at 288:2–292:16.)  He admits that was able to receive cleaning supplies from Wexford employees to clean his CPAP machine throughout his tenure in IDOC facilities.  (*See* Pl.'s Resp. to Pl.'s SOAF ¶ 46, 66.)  However, his machine was never replaced.  (Def.'s Resp. to Pl.'s SOAF ¶ 25).

At Stateville, where Sanchez was housed between June 2018 and July 2019, medical director Dr. Christian Okezie saw and personally examined Sanchez on August 3, 2018 and on October 3, 2018.  (*Id.* ¶ 17).  There is no mention in Okezie's clinical notes of Sanchez complaining about the condition of his CPAP machine.  (*Id.* ¶ 21.)  Okezie submitted a declaration stating that the medical record reflected all subjective complaints that Sanchez voiced during each meeting.  (*Id.* ¶ 17.)  Dr. Marlene Henze, who replaced Okezie as medical director in 2018, testified that she saw Sanchez five times between October 2018 and May 2019.  (*Id.* ¶ 35.)  In her notes from these visits, Dr. Henze did not chart any complaints regarding Sanchez's CPAP machine or supplies.  (*Id.*).  Henze testified that if Sanchez had complained about his machine or lack of supplies, it would appear in her records.  (*Id.* ¶ 34.)  Receipts indicate that Sanchez received replacement supplies on at least six occasions while at Stateville, which included tubing, filters, and cleaning soap.  (*Id.* ¶ 66.)

At Hill, where Sanchez was housed from July 2019 to November 2019, records indicate that Sanchez was instructed to file a sick call slip when he needed supplies for his CPAP machine.  (Pl.'s Resp. to Def.'s SOF ¶ 46.)  Nurse Practitioner Stephanie Steele testified that she interacted with Sanchez and discussed the condition of his CPAP machine.  (Pl.'s Resp. to Def.'s SOF ¶ 47; Dkt. No. 148-13 ("Steele Dep.") at 34:22 – 35:1; 45:8–13.)  According to Steele, Sanchez had complained to a junior nurse about not having filters and distilled water for his

machine.  (Steele Dep. at 44:15–45:7; (Dkt. No. 148-4) ("IDOC Medical Records") at 716–17.)

Steele stated that she addressed Sanchez's concerns and scheduled him to receive replacement

CPAP supplies.  (*Id.* at 64:66–65.)  Steele also testified that she advised Sanchez that soap to

clean his CPAP machine was available for purchase at the commissary.  (*Id.* 47:8–14.)

Between September and November 2019, Sanchez was seen at least four times by

medical professionals at Hill.  (Pl.'s Resp. to Def.'s SOF ¶ 50.)  The records of these visits do

not indicate that Sanchez complained about the condition of his CPAP machine.  (*Id.*)  Steele

testified that Sanchez never mentioned that he ingested cockroaches or that his CPAP machine

was contaminated.  (*Id.* ¶ 51.)  She says that she never denied Sanchez any CPAP supplies.

(Steele Dep. at 70:1–4.)  Emily Spencer, a certified Nurse Assistant at Hill, testified that that she

interacted with at least 13 other inmates at Hill who used CPAP machines and no one had

complained about the lack of supplies.  (*Id.* ¶ 53; Dkt. No. 148-14 ("Spencer Dep.") at 7:2–9,

40:19–24.)

At Danville, where Sanchez was housed from November 2019 to September 2020,

Sanchez was seen at least 28 times by Wexford personnel during sick call.  (*Id.* ¶ 63.)  On these

dates, there is no record of a complaint regarding his CPAP machine or CPAP supplies. (*Id.*)

The medical director at Danville, Dr. Justin Young, met individually with Sanchez several times

outside of the sick call process to address his medical concerns.  (*See generally* Pl.'s Resp. to

Def.'s SOF ¶¶ 54–62.)  Young stated that any complaint that Sanchez made about his CPAP

machine or CPAP supplies during these meetings would be noted in his chart.  (*Id.* ¶ 62.)  On

December 12, 2019, Sanchez requested a replacement CPAP part.  (*Id.* ¶ 60; Dkt. No. 148-15

("Young Dep.") at 46:25–47:15.)  On December 19, 2019, Sanchez complained to Dr. Young

during an examination that he needed new tubing and a filter for his CPAP machine.  (*Id.* ¶ 61;

Young Dep. at 49:8–50:10, 76:5–18.) Young addressed Sanchez's complaint by putting an order in his chart. (*Id.* at ¶ 58; Young Dep. at 40:16.) Following this visit, Young stated that he advocated for Sanchez with the medical records director to obtain the replacement supplies. (Pl.'s Resp. to Def.'s SOF ¶ 61.) There is no indication in the record as to whether Sanchez received the replacement part. Although there were other inmates at Danville with CPAP machines, Young stated that he had not seen any patients with verifiable infections from dirty CPAP machines, including Sanchez. (*Id.* ¶ 56.)

## PROCEDURAL HISTORY

Sanchez first filed this lawsuit in June 2019, when he was housed at Hill. (Dkt. No. 1.) After being appointed *pro bono* counsel, Sanchez filed a second complaint, which he later amended. (Amended Complaint (Dkt. No. 17); Second Amended Complaint (Dkt. No. 53).) Wexford answered the Second Amended Complaint, and the parties began discovery. (*See* Answer.) We entered an agreed protective order governing the procedure for producing documents or information covered by the Health Insurance Portability and Accountability Act. (Dkt. No. 79 ("HIPAA Protective Order").)

Sanchez served his first set of interrogatories on Wexford, to which Wexford responded on October 14, 2020. (Dkt. No. 153-5.) Among other things, the interrogatories requested that Wexford provide "the names, IDOC numbers, and contact information for all inmates who use a CPAP [machine] since May 15, 2018." (*Id.* ¶ 3.) Wexford objected to this information as "overly broad and unduly burdensome to the needs of the litigation, as well as seeking information protected under the HIPAA Protective Order." (*Id.*) Sanchez did not move to compel production of these documents.

Sanchez also sent requests for production demanding that Wexford provide "all documents and electronically stored information identifying the number of CPAP machines

7

issued to inmates," as well as certain other information regarding Sanchez's grievances and medical documentation. (Dkt. No. 153-5 at 2.). Wexford responded and indicated that none of the information Sanchez requested was in its possession. (*Id.*)

On September 13, 2021, Sanchez sent a letter to Wexford requesting that it produce missing discovery, including responses to the interrogatories and document requests referenced above. (*Id*. at 13–15.) Wexford responded the next day, stating that the information that Sanchez requested was not in its possession. (*Id*. at 16.) On September 17, 2021, Sanchez sent a final letter to Wexford demanding the requested discovery and asking Wexford to reconsider its position that it could not produce the requested information under the HIPAA Protective Order. (*Id*. at 17–19.) Wexford did not respond to this letter, and Sanchez did not move to compel production of this information while discovery was open. (*See* Def.'s Resp. to Pl.'s SOAF ¶ 35.)

## LEGAL STANDARD

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, "[w]e consider all of the evidence in the record in the light most favorable to the non-moving party, and we draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020) (citation omitted). We will not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Orozco v. Dart*, 64 F.4th 806, 814 (7th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The initial burden is on the moving party to identify portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). "[A] party who fails to produce evidence sufficient to establish an element essential to that party's case on which they bear the burden of

proof cannot survive a summary judgment challenge." *Orozco*, 64 F.4th at 814 (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (citation omitted).

## ANALYSIS

### I.    Sanchez's Eighth Amendment Deliberate Indifference Claim

The Eighth Amendment of the Constitution safeguards prisoners against a lack of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (citation omitted). "Accordingly, 'deliberate indifference to serious medical needs' of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (quoting *id.* at 104).

To demonstrate deliberate indifference to serious medical needs, a plaintiff must present evidence that he "suffered from an objectively serious medical condition" and that an official knowingly or recklessly disregarded it. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). The first element of this standard is objective and may be satisfied "by showing that the plaintiff suffered from a condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Donald*, 982 F.3d at 458 (citation and quotation marks omitted). The second element is subjective and "is proven by demonstrating that [an] official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Id.* (quotation omitted).

Section 1983 liability has been extended to private corporations like Wexford that act under the color of state law. *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010). However, "[t]he doctrine of *respondeat superior* does not apply to § 1983 actions." *Sanville v.*

*McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (citation omitted). An entity may therefore only be liable for Eighth Amendment deliberate indifference "if institutional policies are themselves deliberately indifferent to the quality of care provided." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017); *accord Shields v. Ill. Dep't. of Corr.*, 746 F.3d 782, 795–96 (7th Cir. 2014). This standard flows from Supreme Court's municipal-liability decision, *Monell v. Department of Social Services,* 436 U.S. 658 (1978). *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (applying *Monell* to Eighth Amendment claims against Wexford).

"*Monell* liability is rare and difficult to establish." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022). In order to survive summary judgment on a *Monell* claim, a plaintiff must first present evidence indicating "that he was deprived of a federal right." *Dean*, 18 F.4th at 235 (quoting *First Midwest Bank ex rel. LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021)). Next, the plaintiff must present evidence of "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Dean*, 18 F.4th at 235; *accord Shields*, 746 F.3d at 796. The plaintiff must show that "the policy or custom demonstrates municipal fault," i.e., deliberate indifference—which is "a high bar." *Dean*, 18 F.4th at 235. Finally, the plaintiff must show that the official policy or custom was the *cause* of the alleged constitutional violation—the "'moving force' behind it." *Id.* (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). The Seventh Circuit has stated that "the central question is always whether an official policy, however expressed . . . caused the constitutional deprivation." *Glisson*, 849 F.3d at 379.

The parties do not dispute that *Monell* applies to Sanchez's claim. (*See generally* Def.'s Summ. J. Mem.; Pl.'s Summ. J. Opp'n.) Sanchez has alleged and argued that Wexford delayed or utterly failed to provide him with replacement CPAP equipment or cleaning supplies. (*See, e.g.*, Def.'s Resp. to Pl.'s SOAF ¶ 30; Sanchez Dep. at 54:4–5.) While Wexford contests these claims, it does not dispute that Sanchez was diagnosed with sleep apnea or that sleep apnea constitutes "an objectively serious medical condition." (*See generally* Def.'s Summ. J. Mem.) We therefore assume for the purpose of this opinion that Sanchez's sleep apnea and related symptoms constitute an "objectively, sufficiently serious" medical condition and analyze whether Wexford's actions rise to the level of deliberate indifference to this condition under *Monell*.

## A.    *Respondeat Superior*

Wexford first argues that we should grant summary judgment because the Second Amended Complaint does not assert any claims against Wexford. (Def.'s Summ. J. Mem. at 4.) As indicated above, vicarious liability does not apply to *Monell* actions. *Sanville*, 266 F.3d at 740. Wexford points out that the allegations in Count II of the Second Amended Complaint do not reference Wexford, but rather the "Wexford Defendants," who are defined as various Wexford employees, and not the entity itself. (*See* Second Amended Complaint.) Wexford argues that Sanchez's *Monell* claim is based on an improper attribution of Wexford's employees' actions to the corporation.

Although Wexford's arguments have some force, we decline to grant summary judgment on this basis alone. Paragraph 23 of the Second Amended Complaint states that "Wexford has a practice and/or policy of not providing and regularly replacing CPAP equipment and supplies to inmates with sleep apnea." (Second Amended Complaint ¶ 23.) Moreover, the Second

Amended Complaint names the Wexford Defendants both individually and in their official capacity.  (*Id.* ¶ 31.)  In the context of municipal liability under *Monell*, "[w]hen a plaintiff sues an individual officer in his official capacity, the suit is treated as if the plaintiff has sued the municipality itself."  *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006), *as amended on denial of reh'g* (May 25, 2006).  We see no reason not to adopt this rationale in this case, given that Wexford is a named defendant on the Second Amended Complaint, and Sanchez has testified that his intent was to assert a claim against Wexford as an entity.  (*See generally* Second Amended Complaint; Sanchez Dep. at 20:18–24, 21:1–2.)  We therefore decline to grant summary judgment on the basis that Sanchez has failed to assert a claim against Wexford as an entity.

### B.        Evidence of Constitutional Injury

Wexford next argues that we should grant its motion for summary judgment because Sanchez has failed to present "verifying medical evidence" of a constitutionally protected injury. (Def.'s Summ. J. Mem. at 6–7; Defendant's Rely in Support of Motion for Summary Judgment ("Def.'s Summ. J. Reply") (Dkt. No. 163) at 1–3.)

If a plaintiff alleges that officials delayed, rather than denied, medical treatment, the plaintiff must also present "verifying medical evidence" that the delay caused harm.  *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *accord Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).  Expert testimony is not necessarily required to establish causation, but medical records, treatment notes, or physician notes that confirm or corroborate a claim that the delay was detrimental may be sufficient.  *Liefer*, 491 F.3d at 715.  However, "evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient to meet the verifying medical evidence requirement if it does not assist the jury to determine if a delay exacerbated the plaintiff's condition or otherwise harmed him."  *Jackson v. Sheriff of Winnebago*

*Cnty.*, No. 3:20-CV-50414, 2022 WL 7498399, at *4 (N.D. Ill. Oct. 13, 2022) (citing *Liefer*, 491 F.3d at 715).

To the extent that Sanchez's argument is premised on a delay in care, we agree that Sanchez has failed to present medically verifiable evidence that a delay in medical care caused his injury. Sanchez has not disclosed expert testimony verifying that he was harmed by a contaminated CPAP machine or the failure to obtain replacement supplies. (*See* Pl.'s Resp. to Def.'s SOF ¶ 78.) Nor has he presented any medical records, treatment notes, or physician notes to support his claim. Sanchez was examined repeatedly by medical staff while he was housed in IDOC, and these records are devoid of any evidence that a delay in providing cleaning or replacement supplies for his CPAP machine caused him harm. (*Id.* ¶¶ 12, 31–39, 50–51, 62–63, 66–67, 77–78.) Sanchez points to certain allegations from the Second Amended Complaint as evidence of injury. (*See* Pl.'s Summ J. Opp'n at 7–8.) But "at the summary judgment stage the plaintiff is required to point to evidence, not rely on the allegations in a complaint." *Gabryszak v. Aurora Bull Dog* Co., 427 F. Supp. 3d 994, 998–99 (N.D. Ill. 2019) (citing *Estate of Perry v. Wenzel*, 872 F.3d 439, 461 (7th Cir. 2017)).[4] We therefore find that, to the extent that Sanchez's claim is premised on a delay in care, Wexford is entitled to summary judgment based on the absence of verifying medical evidence in the record.

---

[4] Sanchez also cites *Love v. Godinez* for the proposition that a plaintiff's own testimony that he suffered maladies like sleep deprivation and headaches is a sufficient evidentiary basis to survive summary judgment. (Pl.'s Summ. J. Opp'n at 7 (citing No. 15 C 11549, 2018 WL 2096375, at *4 (N.D. Ill. May 7, 2018).) But *Love* involved an Eighth Amendment conditions of confinement claim, not a deliberate indifference claim (as is the case here). *See* 2018 WL 2096375 at *1. Although Sanchez filed a conditions of confinement claim against IDOC, he has not filed an analogous claim against Wexford. (*See generally* Second Amended Complaint). Nor can he. As Sanchez admits, Wexford was not responsible for the conditions that Sanchez experienced at Danville, Stateville, and Hill, since its contract with IDOC related only to the provision of medical services. (*See* Pl.'s Resp. to Def.'s SOF ¶¶ 79–80 (admitting that Wexford had no role in determining an inmate's housing or providing pest-removal services).)

Sanchez's claim is not premised *solely* on a delay in care, however.  Sanchez has testified that, at certain instances, Wexford failed to provide him with replacement CPAP equipment or supplies altogether.  (*See, e.g.*, Sanchez Dep. at 54:4–5 ("I never received supplies ever.").)  To the extent that Sanchez's claim is premised on a wholesale denial of care, rather than merely a delay in care, we decline to grant summary judgment and proceed to consider the merits of the parties' *Monell* arguments.

### C.     Evidence of a Policy, Custom or Practice

As stated above, to establish *Monell* liability, a plaintiff must present evidence of "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority."  *Dean*, 18 F.4th at 23.  Sanchez does not allege or argue that his injury was caused by an individual with policymaking authority.  (*See generally* Second Amended Complaint; Pl.'s Summ. J. Opp'n.)  We therefore consider only whether Sanchez has presented adequate evidence of (1) an express policy or (2) a widespread custom or practice.

Sanchez first argues that Wexford has a policy of not providing replacement CPAP supplies or equipment to inmates.  This theory founders, however, because Sanchez admits there is no evidence of an express Wexford policy (written or otherwise) governing the provision of CPAP equipment and replacement supplies.  (*See generally* Def.'s Resp. to Pl.'s SOAF; Pl.'s Resp. to Def.'s SOF ¶¶ 71–72.)  Sanchez acknowledges that the sick call directive (which is the only express policy referenced in his statement of fact) is an IDOC policy and not a Wexford policy.  (Pl.'s Resp. to Def.'s SOF ¶ 10.)  The absence of a Wexford policy is fatal to a *Monell* claim in this context.  *See Lewis v. Wexford Health Sources, Inc.,* No. 14 C 10098, 2016 WL

7240761, at *3 (N.D. Ill. Dec. 15, 2016) (denying plaintiff's motion for summary judgment based on failure to demonstrate that Wexford had a policy of denying inmates access to a CPAP device).

Conceding that no policy exists, Sanchez next argues instead that the *absence* of such a policy gives rise to liability under *Monell*. (Pl.'s Summ. J. Opp'n at 9.) According to Sanchez, "[t]he lack of a policy is itself actionable" and "[t]he failure of Wexford to take appropriate steps to protect persons with sleep apnea" reflects a policy of deliberate indifference. (*Id.*)

While the Seventh Circuit has held that an entity's failure to implement policies or procedures can, in some circumstances, constitute deliberate indifference, a plaintiff must present evidence showing that the defendant made a "conscious decision not to take action." *Glisson*, 849 F.3d at 381. The facts of *Glisson* are illustrative. There, after the plaintiff's son died of a chronic illness in an Indiana state prison, she presented evidence at summary judgment that the prison's medical care provider had failed to implement Indiana Department of Corrections guidelines concerning the provision of care to individuals with chronic conditions. *Id.* at 379–80. The Seventh Circuit held that there was a triable issue with respect to *Monell* liability because "the existence of the guidelines, with which [the care provider] was admittedly familiar, [was] evidence that could persuade a trier of fact that [the care provider] consciously chose the approach that it took." *Id.* at 380.

Demonstrating a conscious decision not to act under *Glisson* is not a high burden—a "single memo or decision showing that the choice to act is deliberate could [] be enough." *Id.* at 381. Here, however, Sanchez has failed to put forth any evidence whatsoever that Wexford's failure to create or implement a policy regarding the cleaning or maintenance of CPAP equipment was a conscious decision. Unlike the plaintiff in *Glisson*, Sanchez has not identified

15

any IDOC policy setting forth guidelines or standards that Wexford deviated from. Sanchez does not argue, for example, that Wexford failed to implement the sick call process. On the contrary, the evidence shows that Wexford employees generally complied with IDOC protocols like the sick call when ordering replacement equipment and cleaning supplies for Sanchez's CPAP machine. This is not a case where the evidence establishes that Wexford failed to implement a policy after being directed to do so in some fashion, and despite having actual knowledge that its failure to implement the policy could violate an inmate's constitutional rights.

Sanchez cites the Center for Medicare and Medicaid Services' internal guidelines, which state how often durable medical equipment like CPAP machines need to be replaced for insurance coverage purposes. (Pl.'s Summ. J. Opp'n at 11-12.) But he presents no evidence that Wexford or its employees were aware of these guidelines or were required to consider them in replacing inmates' durable medical equipment. *Compare Glisson*, 849 F.3d at 381 (finding that the care provider was "admittedly familiar" with the Indiana Department of Corrections memo). There is no basis upon which to conclude that Wexford's failure to follow Medicare guidelines was evidence of conscious decision-making.

Having failed to establish a policy of deliberate indifference, Sanchez next argues that Wexford had a custom or practice of failing to provide inmates with replacement CPAP supplies and cleaning equipment. (Pl.'s Summ. J. Opp'n at 12–15.)

Demonstrating a custom or practice requires evidence of "a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010). To be actionable, a custom or practice must be "so pervasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). A plaintiff must

point to "systemic and gross deficiencies" of which the policymakers had knowledge. *Id.*; *accord Dixon v. Cnty. of Cook*, 819 F.3d 343, 349 (7th Cir. 2016). Generally, a single instance of deprivation will be insufficient to support a custom or practice claim. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

We find that the evidence, even when viewed in the light most favorable to Sanchez, is insufficient to demonstrate a custom or practice of deliberate indifference. Sanchez cites no examples of other inmates in IDOC experiencing injuries due to Wexford's failure to clean or replace their CPAP equipment. (*See generally* Def.'s Resp. to Pl.'s SOAF.) Indeed, Wexford employees testified that other IDOC inmates who had CPAP machines never complained of issues with their machines. (*See id.* ¶¶ 53, 56.) The Seventh Circuit has repeatedly rejected *Monell* claims based on a plaintiff's individualized experience without evidence of other constitutional violations. *See Dean*, 18 F.4th at 240; *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 568 (7th Cir. 2021) (establishing *Monell* liability "is a difficult task when allegations stem from the experiences of one person"); *Calderone v. City of Chi.*, 979 F.3d 1156, 1165 (rejecting as-applied challenge to municipal policy based on failure to identify any other employees whose rights had been impacted); *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) ("*Monell* claims based on allegations of an unconstitutional municipal practice or custom—as distinct from an official policy—normally require evidence that the identified practice or custom caused multiple injuries.").

Sanchez argues that Wexford improperly withheld the names of other IDOC inmates who used CPAP machines in response to his discovery requests and asks us to draw an adverse inference against Wexford on this basis. (Pl.'s Summ. J. Opp'n at 9–10.) We are sympathetic to the difficulties a plaintiff like Sanchez faces during discovery when attempting to prove a

widespread custom or practice under *Monell*. *See Howell*, 987 F.3d at 656–58 (stating that a plaintiff should have "a fair opportunity both to discover and then to prove similar wrongs."). But in order to draw an adverse inference based on a defendant's failure to produce documents, the facts must suggest that the defendant intentionally withheld or destroyed the documents in bad faith. *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). Sanchez has presented no evidence of bad faith. During discovery, Wexford took the position that the production of inmates' medical records would violate HIPAA Protective Order. (Dkt. No. 153-5.) After the parties communicated their respective positions, Sanchez failed to move to compel the production of the medical records. We cannot grant Sanchez an adverse inference where there is no evidence in the record that Wexford acted in bad faith, and Sanchez failed to raise the issue.

This leaves Sanchez's own grievances and testimony as the sole basis for his deliberate indifference claim. (Pl.'s Summ. J. Opp'n at 14 ("Plaintiff's . . . incessant grievances relating to CPAP supplies and cleaning solutions indicate that Wexford and its medical staff were well aware of the Plaintiff's need but did almost nothing.").) Wexford argues that the grievances are inadmissible hearsay because Sanchez is offering them for the truth of what they assert. (Def.'s Summ. J. Reply. at 6–7.) Although Wexford is correct, the statements made by Sanchez in the grievances concern the topics of his personal knowledge of which he is competent to testify at trial. *Rankin v. Wexford Health Sources, Inc.*, No. 16 C 9534, 2019 WL 3554543, at *6 (N.D. Ill. Aug. 5, 2019) (citing *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016)). We can therefore consider their content for the purposes of the instant motion.

Regardless, Sanchez's testimony is an insufficient basis upon which to establish a custom or practice of deliberate indifference. His claims are belied by his own medical records, which

contain no indication that his requests for cleaning supplies or replacement equipment went unaddressed. (Pl.'s Resp. to Def.'s SOF ¶¶ 32–37, 50–51, 62–63.) On the contrary, in the instances where Sanchez did raise his concerns to Wexford employees, the evidence shows that Wexford personnel responded to his concerns and made an effort to procure supplies. (*Id.* ¶¶ 47, 60–61.)

Sanchez admits that he received replacement filters and soap to clean his CPAP machine on at least five occasions at Stateville after he complained about the alleged cockroach infestation in his cell. (Pl.'s Resp. to Def.'s SOF ¶66.) At Hill, Sanchez was given soap to clean his CPAP machine and admits that he was instructed to put in a sick call slip when CPAP supplies were needed. (Pl.'s Resp. to Def.'s SOF ¶ 46.) And when Sanchez made a request for replacement equipment at Danville, Dr. Young worked with him to address his request. (*Id.* ¶ 61.) While there is no evidence that Sanchez actually received the replacement equipment he requested from Dr. Young, Young testified that he had no control over supply or delivery issues and that he had never seen an inmate with a medically-verifiable infection from a dirty CPAP machine, including Sanchez. (*Id.* ¶¶ 55–58.)

Even when viewed in the light most favorable to him, Sanchez's testimony is an insufficient basis upon which to conclude that Wexford's actions rose to the level of "systemic and gross deficiencies," especially since Sanchez has failed to present any medical evidence that he was harmed by an alleged delay or denial of care. *See Brown*, 520 U.S. at 407 ("[a] showing of simple or even heightened negligence will not suffice" to demonstrate deliberate indifference); *see also Hildreth*, 960 F.3d at 426 (holding that three instances of late medication refills over nineteen months were insufficient to establish an actionable custom or practice even though the delay resulted in painful withdrawal symptoms); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th

Cir. 2008) (holding that four botched refills of an inmate's prescription within eleven months were insufficient evidence of a unconstitutional custom or practice).

In sum, Sanchez has failed to demonstrate the existence of a policy, custom, or practice that would give rise to liability under *Monell*. We therefore grant Wexford's motion for summary judgment on Sanchez's Eighth Amendment deliberate indifference claim. Because Sanchez has failed to demonstrate a policy, custom, or practice, we do not address the parties' arguments regarding causation.

## II.     Arguments Concerning the ADA

Before concluding, we briefly address the relevance of the ADA to Sanchez's claim against Wexford. At various points in his opposition brief, Sanchez cites the requirements of the ADA and whether sleep apnea is a protected disability. (*See* Pl.'s Summ. J. Opp'n at 2–4, 11.) But the Second Amended Complaint does not allege that Wexford or its employees violated the ADA. (*See* Second Amended Complaint). These arguments are therefore irrelevant.

Even if Sanchez had alleged an ADA claim against Wexford, such claim would fail as a matter of law. Title II of the ADA only provides a plaintiff relief against "public entities." 42 U.S.C. § 12132. A majority of federal circuit courts, as well as other trial courts in the Seventh Circuit, have held that private medical care providers like Wexford are not "public entities" within the meaning of the ADA. *See Eby v. Okezie,* No. 19 C 8404, 2021 WL 4146882, at *6 (N.D. Ill. Sept. 13, 2021) (granting motion to dismiss ADA claims against Wexford on the basis that Wexford is not a public entity); *Bernard v. Illinois Dep't of Corr.*, No. 3:20-CV-50412, 2022 WL 17338154, at *4 (N.D. Ill. Nov. 30, 2022) (same); *see also Green v. City of N.Y.*, 465 F.3d 65, 79 (2d Cir. 2006) (holding that private hospital that carried out a public function through a contract with the City of New York was not "public entity"); *accord Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x 163, 170 (3d Cir. 2015); *Phillips v. Tiona*, 508 F. App'x 737, 754

(10th Cir. 2013); *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010). Sanchez cites no authority to the contrary. We therefore grant Wexford's motion for summary judgment to the extent that Sanchez attempts to assert an ADA claim against Wexford.

## CONCLUSION

For the foregoing reasons, we grant Defendant Wexford Health Sources, Inc.'s motion for summary judgment. Judgment is entered for Wexford on Plaintiff's deliberate indifference claim. Defendant Wexford Health Sources, Inc. is therefore terminated as a defendant. It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: June 28, 2023