**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| EDDIE SANCHEZ (K-50113), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 CV 4143 |
| v. | ) | |
| | ) | Judge Marvin E. Aspen |
| ROB JEFFREYS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff, Eddie Sanchez, a former inmate of the Illinois Department of Corrections ("IDOC"), brings claims against several IDOC employees (the "IDOC Defendants" or "Defendants") under 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act ("ADA"). (*See* Second Amended Complaint ("2d Am. Compl.") (Dkt. No. 53).) Sanchez asserts Eighth Amendment claims for unconstitutional conditions of confinement, namely, pest infestations in his cells (Count I) and deliberate indifference to his medical needs relating to sleep apnea (Count II). (*See id.* at 23-26.) He also alleges that the IDOC Defendants intentionally discriminated against him and failed to reasonably accommodate his disability in violation of the ADA by denying him clean equipment and supplies to treat his sleep apnea (Count III). (*See id.* at 26-30.) The IDOC Defendants now move for summary judgment on each claim. (IDOC Defendants' Motion for Summary Judgment (Dkt. No. 169); IDOC Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs.' Mem.") (Dkt. No. 169-1).) Sanchez, through his attorney, opposes Defendants' motion. (Plaintiff's Memorandum of Law in Response to IDOC Defendants' Motion for Summary Judgment ("Pl.'s Resp.") (Dkt. No. 178).) For the reasons that follow, we grant Defendants' motion.

## LOCAL RULE 56.1

Before setting out the undisputed material facts, we must address as an initial matter the parties' failure to comply with certain requirements of Local Rule 56.1, which governs filing and responding to summary-judgment motions in this district.

Asserted facts may be disregarded if not supported with evidence and, if supported, may be deemed admitted if not controverted with specific citations to evidence. LR 56.1(d)(2) & (e)(3). Sanchez attempts to both dispute various facts asserted by the Defendants and support his own asserted additional facts, in whole or in part, by citing his allegations in the Second Amended Complaint. (*See, e.g.,* Plaintiff's Response to IDOC Defendants' Rule 56.1 Statement of Undisputed Facts in Support of Their Motion for Summary Judgment ("Pl.'s Resp. Defs.' SOF") (Dkt. No. 183) ¶¶ 36, 43; Plaintiff's Statement of Additional Material Facts Pursuant to Local Rule 56.1(b)(3) (Department of Corrections) ("Pl.'s SOAF") (Dkt. No. 179) ¶¶ 1, 2, 4-8, 10-18, 20-22, 24, 26-30, 32, 35, 39.) The Second Amended Complaint is not verified, and, as we noted in our earlier Memorandum Opinion and Order on defendant Wexford Health Sources, Inc.'s motion for summary judgment, allegations are not evidence. (Mem. Op. & Order of June 28, 2023 at 3 n.3 (Dkt. No. 175).) For purposes of this opinion and order, we deem admitted Defendants' asserted facts that Sanchez purports to dispute solely with his unsworn allegations; we also disregard the additional facts or portions thereof that Sanchez purports to support solely with those allegations. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) (mere allegations in a complaint are not evidence and do not establish a triable issue of fact).

Sanchez also attempts to dispute certain statements of fact by responding that he has "no knowledge as to [their] truth." (Pl.'s Resp. Defs.' SOF ¶¶ 30, 32.) (He does not, however, raise an evidentiary objection to either statement.) These are insufficient responses under Local Rule

56.1(e), which gives just three options for each response to an asserted fact—admit, dispute, or admit in part and dispute in part—and in the event of a dispute requires a party to cite specific evidentiary material that controverts the fact. We therefore deem these responses admissions. *See Del Signore v. Nokia of Am. Corp.*, No. 20 C 4019, 2023 WL 3292570, at *2 (N.D. Ill. May 5, 2023) (a party's lack of knowledge of whether an asserted material fact is true does not suffice to genuinely dispute the fact for summary-judgment purposes); *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1097 (N.D. Ill. 2016).

Next, Sanchez responds to several of Defendants' fact statements by "disput[ing] that [the] statement fairly and accurately reflects" (1) "the entirety of" certain grievances he filed or (2) "the sum total of over seven (7) hours of Plaintiff's deposition testimony and the related records concerning the subject matter asserted." (*See, e.g.*, Pl.'s Resp. Defs.' SOF ¶¶ 33, 34, 40, 46.) We have disregarded these purported disputes because Sanchez does not support them with citations to specific evidence and does not explain how the testimony and records controvert the asserted facts, as required by Local Rule 56.1(e)(3). Referring to the "sum total" of Sanchez's testimony and unspecified "related records" is insufficient. The mechanism for Sanchez to bring to our attention other *specific* facts contained in the record is his own statement of additional facts.

Sanchez's responses to Defendants' three fact statements regarding the procedures for ordering medical parts and supplies at the institutions where he was incarcerated are also improper. Instead of admitting or disputing these procedures, Sanchez states that he was not able to "regularly" order and receive medical supplies at one institution and "disputes that he ever received" replacement parts or supplies at the other two institutions. (Pl.'s. Resp. Defs.' SOF ¶¶ 37-39.) Sanchez's statements about whether he actually received supplies at each institution are new facts and not responsive to the asserted facts about the procedures themselves. Thus, he

violates Local Rule 56.1(e)(2) ("A response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made."). We deem Defendants' statements admitted. *See, e.g.*, *Kumar v. Accreditation Council for Graduate Med. Educ.*, No. 21 C 2822, 2023 WL 22079, at \*7 n.25 (N.D. Ill. Jan. 3, 2023).

Some of Sanchez's statements of additional material facts are improper because they do not consist of "concise" paragraphs as required by Local Rule 56.1(d)(1). Sanchez needlessly includes several block quotations from his deposition testimony; for instance, Paragraph 19 includes fifteen deposition excerpts. In Paragraph 39, Sanchez provides lengthy quotations from eighteen grievances he filed. We will not strike the paragraphs, as Defendants request, but we will simply consider the quoted deposition testimony to be the specific evidentiary material that Sanchez cites in support of his fact statements rather than statements that require a response and will consider the language of certain grievances in the context of specific arguments.

Defendants do a better job of complying with the Local Rule, but their submissions still have problems. One is that in both their reply brief and in their response to Sanchez's statement of additional facts, Defendants ask us to strike more than twenty of Sanchez's statements of additional facts. We deny the request; Local Rule 56.1(e)(2) explicitly states that such motions are "disfavored." The appropriate remedy is not to strike the statements; rather, as Local Rule 56.1(e)(2) instructs, if a party contends that its opponent has included objectionable or immaterial evidence or argument in a Local Rule 56.1 submission, "the party's argument that the offending material should not be considered should be included in its response or reply brief." We have considered the evidentiary arguments that Defendants properly raise in their reply brief.

Defendants also incorrectly contend in their response to Sanchez's statement of additional facts that Sanchez's deposition testimony is "only his allegations and not 'evidence.'" (IDOC

Defendants' Responses to Plaintiff's Local Rule 56.1 Statement of Additional Facts ("Defs.' Resp. Pl.'s SOAF") (Dkt. No. 194) ¶¶ 32, 35.)[1]  Deposition testimony based on personal knowledge is "perfectly admissible evidence through which a party" may attempt to present his side of the story at summary judgment, so Sanchez properly supports the portions of his statements as to which he has personal knowledge.[2]  *See Hill v. Tangherlini*, 724 F.3d 965, 967-68 (7th Cir. 2013).  In a similar vein, Defendants object to Sanchez's reliance on his grievances to support various asserted fact statements.  (IDOC Defendants' Reply in Support of Motion for Summary Judgment ("Defs.' Reply") at 2-3 (Dkt. No. 193).)  We overrule the objection.  As explained in our earlier opinion, the statements Sanchez made in his grievances concern topics of his personal knowledge about which he is competent to testify at trial, so we can consider their content for the purposes of the instant motion.  (Mem. Op. & Order of June 28, 2023 at 18.)

## MATERIAL FACTS

We take the following material facts from the properly supported and undisputed (or not properly disputed) facts in the parties' Local Rule 56.1 submissions[3] and the evidence cited therein.

---

[1]    Defendants' response to Sanchez's statement of additional facts contains two Paragraph 11s, throwing off the correspondence of the responses that follow. When we cite Defendants' responses to subsequent paragraphs, we use the correct, original paragraph number.

[2]    For example, Sanchez's deposition testimony supports his statement that he did not receive any supplies at certain prisons, (Pl.'s SOAF ¶ 35), but not his statement that the conditions of his confinement caused him to develop "sinus infections, ulcers, and stomach disorders," (*id.* ¶ 32). Medical opinions on causation are beyond the realm of Sanchez's personal knowledge and experience as a layperson.  In any event, facts relating to causation and damages are not material to the legal issues raised in Defendants' motion.

[3]    *See* Pl.'s Resp. Defs.' SOF; Pl.'s SOAF; Defs.' Resp. Pl.'s SOAF; IDOC Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("Defs.' SOF") (Dkt. No. 169-2).

Later in this opinion, we will set out other undisputed facts relevant to particular claims in the substantive discussion of those claims.

In November 2017, while Sanchez was detained at the Cook County Jail during the pendency of his criminal trial, he was diagnosed with sleep apnea, a sleep disorder that interrupts a person's breathing, and given a CPAP (continuous positive airway pressure) machine to assist with his breathing while sleeping. (Defs.' Resp. Pl.'s SOAF ¶¶ 21, 24.) Sanchez was permitted to (and did) take the machine with him when he was later transferred to correctional institutions within the IDOC system, including Stateville Correctional Center ("Stateville"), Hill Correctional Center ("Hill"), and Danville Correctional Center ("Danville"). (*Id.* ¶ 24.) To function, CPAP machines require durable medical equipment and supplies, including tubing, a face mask, headgear, filters, and a water chamber. (*Id.* ¶ 27.)

Sanchez entered Stateville in June 2018 and remained there a little over a year, until July 2019. (Pl.'s Resp. Defs.' SOF ¶ 1.) Over the course of that period, he was assigned to nine different cells. (*Id.* ¶ 28.) Sanchez complains about the conditions he encountered in two cells located in Stateville's "D-House": (1) D-01-58, to which he was assigned for about four months, from August 22, 2018 to December 25, 2018; and (2) D-01-49, to which he was assigned for almost five months, from December 25, 2018 to May 16, 2019. (*Id.* ¶¶ 28-29; 2d Am. Compl. ¶ 88; Pl.'s SOAF ¶ 29.) He says that the conditions were inhumane because those cells were infested with cockroaches and other pests, including water bugs and spiders. (Transcript of Deposition of Eddie Sanchez ("Sanchez Dep.") at 264-77 (Dkt. No. 169-5).) The infestation was so severe that in December 2018, cockroaches infiltrated Sanchez's CPAP equipment and laid eggs in it, causing him to swallow the cockroaches and eggs when he used the machine. (Sanchez Dep. at 284-86.) Sanchez filed grievances about the insect infestations in D-01-58 and D-01-49 in September 2018,

December 2018, March 2019, and May 2019. (Defs.' Resp. Pl.'s SOAF ¶ 39; Pl.'s Exs. 28, 37, 38, 39 (Dkt. Nos. 182-2 & 182-4).) He admits that Stateville provided him with bleach and disinfectant every Sunday. (Pl.'s Resp. Defs.' SOF ¶ 31.)

Sanchez says that at Stateville, he requested replacement parts and cleaning supplies for his CPAP machine but did not always receive them or received incompatible parts. (Sanchez Dep. at 22-23, 145-47.) Receipts Sanchez signed at Stateville show that he received CPAP tubing on October 1, 2018; 2 CPAP filters and 8 ounces of soap on November 13, 2018; 3 CPAP filters and 8 ounces of soap on January 2, 2019; 1 CPAP filter and 8 ounces of soap on January 15, 2019; 1 CPAP filter, 1 CPAP face mask, and 8 ounces of soap on March 4, 2019; and 1 CPAP filter and 8 ounces of soap on May 3, 2019. (Pl.'s Exs. 30-35 (Dkt. No. 182-2); Pl.'s Resp. Defs.' SOF ¶ 35; Sanchez Dep. at 145-47.) Sanchez testified that the tubing he received was "too small," so he made a notation to that effect on the receipt and did not use it. (Sanchez Dep. at 145; Pl.'s Ex. 30.) Sanchez also stated that while medical personnel at Stateville suggested that he use the bar soap he was given to clean his CPAP machine, he believes it is "toxic" to use bar soap for that purpose and asserts that he should have been given liquid antibacterial soap. (Sanchez Dep. at 22-26; Pl.'s Resp. Defs.' SOF ¶ 40.) In the grievances Sanchez filed in December 2018, March 2019, and May 2019, Sanchez complained about his "dirty" and "infested" CPAP machine and the failure to provide him with "adequate" cleaning supplies and replacement parts. (Pl.'s Exs. 37, 38, 39.)

In July 2019, Sanchez was transferred to Hill, where he remained until November 2019, when he was transferred to Danville. (Pl.'s Resp. Defs.' SOF ¶ 1.) He remained at Danville until he was paroled in September 2020. (*Id.*) At Hill and Danville, Sanchez never received any cleaning supplies or replacement parts for his CPAP machine, despite having filed several grievances about the problem. (Sanchez Dep. at 54; Defs.' Resp. Pl.'s SOAF ¶¶ 35, 39.) Sanchez

admits that his CPAP machine continued to function and that he used it throughout his incarceration, but stated at his deposition, "What else was I going to do?" (Pl.'s Resp. Defs.' SOF ¶ 42; Sanchez Dep. at 58.)

The IDOC contracted with Wexford Health Sources, Inc. ("Wexford"), a private corporation, to provide health care to inmates in IDOC prisons, including Stateville, Hill, and Danville. (Defs.' Resp. Pl.'s SOAF ¶ 20.) Under that contract, Wexford is responsible for providing durable medical equipment. (Id. ¶ 27.) At Stateville, inmates could request replacement parts and cleaning supplies through medical professionals or the IDOC Correctional Supply Supervisor, Joe Sheehy, who is not a defendant in this action. (Defs.' SOF ¶ 37.) At Hill and Danville, inmates requested such supplies through medical professionals in the "sick call" process. (Defs.' SOF ¶¶ 38-39.)

## LEGAL STANDARDS

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, we consider the evidence and all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Liberty Mut. Fire Ins. Co. v. Clayton*, 33 F.4th 442, 447 (7th Cir. 2022). The moving party bears the initial responsibility of informing us of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 567 (7th Cir. 2021). The non-moving party then must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019). "[A] party who fails to produce evidence sufficient to establish an element essential to that party's case on which they bear the burden of

proof cannot survive a summary judgment challenge." *Orozco v. Dart*, 64 F.4th 806, 814 (7th Cir. 2023) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (citation and internal quotation marks omitted); *see also Orozco*, 64 F.4th at 814 (summary judgment is improper when "the evidence is such that a reasonable jury could return a verdict for the non-moving party"). At the summary-judgment stage, we do not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019).

## ANALYSIS

### I.      Eighth Amendment Conditions Claim (Count I)

In Count I, Sanchez asserts that officials at Stateville were deliberately indifferent to the conditions of his infested cells. (2d Am. Compl. at 23-24.) The Eighth Amendment prohibits punishments that involve the unnecessary and wanton infliction of pain and thus gives rise to constitutional claims by inmates alleging that the conditions of their confinement violate this prohibition. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "[E]xtreme deprivations are required to make out a conditions-of-confinement claim." *Giles*, 914 F.3d at 1051 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "If under contemporary standards the conditions cannot be said to be cruel and unusual, then they are not unconstitutional, and 'to the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* (internal punctuation omitted) (quoting *Rhodes*, 452 U.S. at 347).

A conditions-of-confinement claim has two components, one objective and one subjective. *Id.* First, the plaintiff must make an objective showing that the conditions were sufficiently

serious—that is, that they denied the inmate "the minimal civilized measure of life's necessities, creating an excessive risk to the inmate's health and safety." *Id.* (citation and internal quotation marks omitted). Under the second component of the claim, the plaintiff must make "a subjective showing of a defendant's culpable state of mind[, which is] deliberate indifference to the inmate's health or safety." *Id.* "Deliberate indifference" means that the defendant "knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). "At a minimum," deliberate indifference is "*actual* knowledge of *impending* harm *easily* preventable." *Turner v. Miller*, 301 F.3d 599, 603 (7th Cir. 2002) (internal punctuation omitted) (quoting *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001)). When evaluating a conditions-of-confinement claim regarding pests, we consider the length and severity of the conditions; whether pests came into contact with the plaintiff, bit him, or caused physical or psychological harm; whether the plaintiff had the ability to address the conditions himself; and whether prison officials reasonably attempted to mitigate the pest concerns. *See Smith v. Dart*, 803 F.3d 304, 309-10 (7th Cir. 2015) (addressing conditions-of-confinement claim of pretrial detainee and emphasizing that there is "little practical difference, if any, between the standards applicable to pretrial detainees and convicted inmates" on such claims); *Munson v. Kink*, No. 21-2738, 2022 WL 17844068, at *2 (7th Cir. Dec. 22, 2022).

### A.    Objectively Serious Conditions of Confinement

The IDOC Defendants contend that the conditions Sanchez experienced were not objectively serious enough to rise to a level of constitutional concern, given that Sanchez was moved four months after his assignment to cell D-01-58 and five months after his assignment to D-01-49; he was provided cleaning supplies to clean his cell each week; and Stateville contracted with an exterminator that sprayed D-House nearly every month during the relevant time period.

In our view, these facts do not establish the IDOC Defendants' entitlement to summary judgment on Count I given Sanchez's evidence of an extensive and persistent infestation. According to Sanchez, pests were "everywhere," and his cells were "a bug show," particularly after the lights were turned off, because outside doors and windows were often left "wide open." (Sanchez Dep. at 264-65.) The infestation was so bad that he went to sleep with the lights on and with a towel wrapped around his eyes, but on occasion he still woke up to a bug crawling on him. (*Id.* at 266, 285-86.) Cockroaches, spiders, and "water bugs" streamed out of the showers (which were next to Sanchez's cell when he was assigned to cell D-01-58) and gathered in the walls and in his television and bed frame. (*Id.* at 265-66; Pl.'s Ex. 28.) Sanchez says that he saw hundreds of insects and cockroaches on a daily basis and was bitten over one hundred times. (Sanchez Dep. at 268-73, 278-79.) In December 2018, the mask and other components of Sanchez's CPAP machine became infested with cockroaches and cockroach eggs, which Sanchez believes he ingested. (*Id.* at 58, 87, 122, 271-72, 285-87.) As a result, he was distressed and felt sick to his stomach. (*Id.* at 271, 288.) Sanchez filed repeated grievances about the infestations. (Pl.'s Exs. 28, 37, 38, 39.)

While there is evidence that an exterminator regularly sprayed D-House, Defendants do not submit evidence of any specific details about that treatment, and there is no evidence that Sanchez's cells themselves were regularly treated.[4] Sanchez testified that he never saw an exterminator at the prison or his cells being sprayed. (Sanchez Dep. at 268-69.) He also testified that certain windows and doors at Stateville were always "wide open" and that the cleaning

---

[4] The Seventh Circuit has observed that evidence of monthly spraying alone "does not necessarily exculpate" a prison official, "since persisting in an ineffective method of pest control may be evidence of deliberate indifference." *Bentz v. Hardy*, 638 F. App'x 535, 537-38 (7th Cir. 2016).

supplies he received on Sundays were ineffective in ameliorating the infestation. (*Id.* at 264-65, 269-70, 272-73.) Furthermore, the fact that Sanchez was moved from cell D-01-58 to cell D-01-49 after four months is of little help to Defendants as to this first prong of the inquiry, considering Sanchez's testimony that it was the "same situation" in D-01-49—"roaches everywhere." (*Id.* at 147-48.) Sanchez lived for a total of nine months in cells that he says were extensively infested. Reading the record in the light most favorable to Sanchez, we are satisfied that he has shown enough on the objective prong of the inquiry. *See, e.g.*, *Byrd v. Hobart*, 761 F. App'x 621, 624 (7th Cir. 2019) (fact issue existed as to whether alleged pest infestations in a prison kitchen created an unreasonable risk to the inmate's health and safety); *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (inmate presented triable issues of fact on his Eighth Amendment claim based on pest infestations and filth). Defendants have not demonstrated that they are entitled to summary judgment on the ground that Sanchez's conditions of confinement were not objectively serious.

### B. Deliberate Indifference

Sanchez runs into trouble, however, with respect to the second, subjective component of the inquiry: whether the eleven remaining IDOC Defendants named in Count I were aware of easily preventable impending harm to Sanchez and deliberately indifferent to it. At the outset, it is important to observe—and clear from the record—that Sanchez was a prolific filer of grievances on a wide variety of topics. (*See, e.g.*, Dkt. No. 169-6; Sanchez Dep. at 188 ("I was a chronic grievance writer").) The fundamental problem is that Sanchez does not connect the conditions described above to any official who had sufficient knowledge of those conditions and failed to take remedial steps. The bulk of Sanchez's arguments rely on glib generalizations or the allegations in the complaint, which are not evidence. No reasonable jury could find that the

Defendants were deliberately indifferent to a substantial, impending risk to Sanchez's health or safety. We will discuss the evidence as to each Defendant in turn.

### 1. Rob Jeffreys

Defendant Rob Jeffreys was the IDOC Director at the relevant time. (Pl.'s Resp. Defs.' SOF ¶ 3.) Sanchez testified at his deposition that he wrote Jeffreys "tons of letters." (Sanchez Dep. at 169.) Yet, as Defendants point out, he does not submit any of those letters or point to evidence of their content. In his response brief, Sanchez complains that Jeffreys "attempts to shift the burden to Plaintiff to produce the letters sent to him and their details." (Pl.'s Resp. at 8.) That reasoning gets the burden of proof backward; it *is* Sanchez's burden at summary judgment to supply evidence tending to show that Jeffreys (and each of the other Defendants) had knowledge of the infestations in Sanchez's cells. *See Gray*, 826 F.3d at 1008. Sanchez also says that the IDOC Defendants did not "produc[e] [in discovery] the letters sent to them by Plaintiff," (Pl.'s Mem. at 9), and there are portions "missing" from Defendants' discovery production, (Pl.'s Resp. Defs.' SOF ¶ 14; Pl.'s SOAF ¶¶ 10, 39). He argues that "the failure to produce documents in discovery should not be rewarded in a Motion for Summary Judgment." (Pl.'s Resp. at 9.) Discovery in this case closed several months ago, however, and Sanchez never sought to compel the production of any documents. "[S]ummary judgment is not the time to complain about what transpired during discovery." *Henderson v. Schwochert*, No. 21-1009, 2022 WL 2298445, at *2 (7th Cir. June 27, 2022) (internal quotation marks omitted) (quoting *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 877-78 (7th Cir. 2021)).

Sanchez also testified that he spoke with Jeffreys in person three times when Jeffreys visited Stateville, but he does not recall the dates of the conversations, only that they occurred when the weather was "hot." (Sanchez Dep. at 169-72.) He does not point to any evidence of

their substance aside from an exchange about Sanchez's request to be transferred to another prison so that he could "go to a drug treatment facility" and "get good time to go home earlier." (*Id.* at 170-72.) Sanchez contends only generally that he spoke with Jeffreys "about his conditions of confinement" but for support cites only the Second Amended Complaint, (Pl.'s SOAF ¶ 2), which is not evidence, as we have explained.[5] Factual allegations not properly supported by a citation to the record are nullities. *Curtis v. City of Chi.*, No. 16 C 8042, 2019 WL 3776154, at *1 (N.D. Ill. Aug. 12, 2019).

Sanchez fails to show that there is a genuine issue of material fact as to whether Jeffreys was deliberately indifferent to a substantial risk of serious harm.

### 2. Randy Pfister

Defendant Randy Pfister was an Assistant Deputy Director for IDOC until he became Warden of Stateville in August 2019. (Pl.'s Resp. Defs.' SOF ¶ 10.) Sanchez says that he had a number of face-to-face conversations with Pfister at Stateville and sent him several letters and received responses, (Sanchez Dep. at 193, 197-206), but as with Jeffreys, Sanchez fails to submit any of that correspondence or point to evidence of the substance of the conversations. Sanchez cannot show that Pfister knew about any risk of harm to him, so he is unable to show deliberate indifference.

### 3. Sherry Benton

Defendant Sherry Benton was a member of the IDOC's Administrative Review Board during Sanchez's incarceration. (Pl.'s Resp. Defs.' SOF ¶ 7.) Sanchez testified that he wrote

---

[5]     We are not obliged to scour the record to find support for Sanchez's claims or unearth material factual disputes. *See Jones v. Bayler,* No. 22-1296, 2023 WL 3646069, at *3 (7th Cir. May 25, 2023); *Castelino v. Rose-Hulman Inst. of Tech.*, 999 F.3d 1031, 1040 (7th Cir. 2021).

letters to Benton outside of the prison grievance process, (Sanchez Dep. at 185), but he fails to submit any such correspondence or evidence of its content. Sanchez also relies on Benton's having completed an IDOC form titled "Administrative Review Board Return of Grievance or Correspondence," stating that Sanchez's Grievance #7413, filed in December 2018, was 'Misdirected'" and instructed him to "[c]ontact [his] correctional counselor or grv ofcr [sic] regarding this issue/status of #7413." (Defs.' Resp. Pl.'s SOAF ¶ 5.) This form appears among the exhibits Sanchez submitted. (Pl.'s Ex. 38 (Dkt. No. 182-4 at 7).) Benton signed it, however, on March 11, 2019, months after Sanchez had received the relief he requested in Grievance #7413 by being moved out of cell D-01-58. Given that the request for relief Sanchez presented in Grievance #7413 was moot by March 2019 and he points to no evidence of Benton's involvement prior to that time, Sanchez's contention that her response was a "deliberate attempt to prevent or delay Plaintiff from achieving any meaningful resolution," (Pl.'s Resp. at 8), is unavailing. Sanchez fails to present evidence that Benton was deliberately indifferent to an impending risk of serious harm.

### 4. Nicholas Lamb

Defendant Nicholas Lamb was an Assistant Warden of Operations at Stateville at the relevant time. (Pl.'s Resp. Defs.' SOF ¶ 17.) Sanchez also fails to demonstrate a genuine issue of fact as to whether Lamb was deliberately indifferent to the pest infestation in his cells. Sanchez argues that he wrote letters to Lamb and did not receive a response. (Pl.'s Resp. at 9-10.) But he does not offer copies of any correspondence with Lamb or evidence as to its contents or when it was sent, so he fails to establish that Lamb knew about any particular conditions, much less the pest infestations. Sanchez also testified that his father told him that he telephoned Lamb and complained that Stateville was infested with roaches and bugs and Sanchez was not receiving

15

supplies for his CPAP machine. (Sanchez Dep. at 255-57.) As the IDOC Defendants correctly point out, (Defs.' Resp. Pl.'s SOAF ¶ 13), Sanchez's testimony repeating what his father told him about his father's conversation with Lamb, offered to establish that his father notified Lamb about conditions at Stateville, is classic hearsay. It is thus inadmissible, and Sanchez cannot rely on it to overcome a motion for summary judgment. *See MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656-57 (7th Cir. 2011).

### 5. Colleen Franklin

Defendant Colleen Franklin was a Correctional Counselor at Stateville at the relevant time. (Pl.'s Resp. Defs.' SOF ¶ 11.) At his deposition, Sanchez testified that he wanted to include Franklin as a defendant in this action because she was involved in processing some of his grievances. (Sanchez Dep. at 214-15.) However, prison officials like Franklin who simply process inmate grievances "lack personal involvement in the conduct forming the basis of the grievance" and consequently are not considered to have had sufficient personal responsibility for a constitutional deprivation.[6] *See Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017); *LaRue v. Obaisi*, No. 18 C 932, 2021 WL 3290919, at *9 (N.D. Ill. Aug. 2, 2021) ("Involvement in the grievance process, standing alone, is insufficient to give rise to personal liability.") (citing *Gevas v. Mitchell*, 492 F. App'x 654, 660 (7th Cir. 2012)).

Sanchez asserts that *Owens* is inapplicable because he talked to Franklin and wrote her letters. But the evidence in that regard is insufficient to raise a genuine issue as to whether Franklin knew about the pest infestation. Sanchez testified that he spoke with Franklin twice in passing

---

[6] Defendants also argue that none of the grievances that were processed by Franklin and Defendant Kelly Ledford were related to the conditions at issue in this action. (Defs.' Mem. at 10.) Sanchez does not respond to this argument and therefore waives it. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

when he was "coming back from the yard." (Sanchez Dep. at 215-17.) He does not remember the dates of those conversations, and the only detail he provided was that he asked Franklin "[w]hat [was] going on with [his] grievance about the CPAP" and she responded that they were "taking care of it. Everything is under control. Relax." (*Id.* at 217.) Sanchez does not point to any evidence that he discussed the pest infestations with Franklin. Sanchez also stated that he sent Franklin letters outside of the grievance process, but he does not recall how many, and he does not submit any correspondence with Franklin or point to evidence of its content.

### 6. Kelly Ledford

Defendant Kelly Ledford was an Office Coordinator at Stateville at the relevant time. (Pl.'s Resp. Defs.' SOF ¶ 12.) Sanchez's showing with respect to Ledford is similarly insufficient. Sanchez alleges that Ledford processed and assigned numbers to certain of his grievances; as discussed above, involvement in the grievance process alone is insufficient to establish personal involvement in a constitutional violation. Sanchez's testimony about Ledford is only that he "told her plenty of times what was going on" (Sanchez Dep. at 220), which is far too vague to permit a reasonable inference that she knew about the pest infestation in Sanchez's cells.

### 7. Darwin Williams

Defendant Darwin Williams was the Assistant Warden of Programs at Stateville at the relevant time. (Pl.'s Resp. Defs.' SOF ¶ 16.) Sanchez alleges that he wrote letters to and spoke with Darwin Williams about his conditions of confinement, (2d Am. Compl. ¶ 37), but cites only his unverified complaint in support of this proposition, (Pl.'s SOAF ¶ 12). Sanchez presents no evidence whatsoever that Darwin Williams had knowledge of the conditions at issue.

### 8.    Sherwin Miles

Defendant Sherwin Miles was the Acting Warden of Stateville from January 2019 to August 2019.  (Pl.'s Resp. Defs.' SOF ¶ 2.)  Sanchez testified that he spoke with Miles in person "[a] couple times, seven, eight times . . . [a]fter December 2018" about the "infestation and CPAP machine."  (Sanchez Dep. at 211-13.)  Defendants contend that Sanchez cannot show deliberate indifference because this testimony is vague, Miles did not become warden of Stateville until after Plaintiff had already been moved out of cell D-01-58 in December 2018, and there is no evidence that the IDOC Defendants received any written grievance Sanchez filed about the infestation in D-01-49 until May 2019, after Sanchez had been moved from that cell.  (Defs.' Mem. at 9-10.)

Given that Sanchez says he spoke with Miles in 2019, the timing of Miles' arrival at Stateville and the lack of a written grievance are not dispositive, but the vagueness of Sanchez's testimony is.  Sanchez has the burden of demonstrating that his communication with a prison official, "*in its content* and manner of transmission," gave that official sufficient notice to alert her to an excessive risk to his health and safety.  *See Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (emphasis added); *see also Turner v. Boughton,* No. 22-1596, 2022 WL 17716778, at *3 (7th Cir. Dec. 15, 2022) (inmate's Eighth Amendment claim failed on summary judgment because he did not "cite any evidence that any defendant had reason to know that the light and noise affecting his cell was excessive, let alone that it kept him awake or produced severe headaches" and thus did not show that prison officials had consciously disregarded a risk of harm).  Sanchez submits no evidence of what he told Miles about "the infestation," or when their conversations occurred during the five months he was assigned to cell D-01-49.  The scant and unspecific testimony that Sanchez relies on is far too vague to permit a reasonable inference that Miles knew Sanchez faced a substantial risk of serious harm as a result of a pest infestation in his cell and failed to take

reasonable measures to abate it. Citing Stateville's contract with an exterminator for monthly sprayings at D-House, Sanchez maintains that Miles, as former warden, "cannot pretend that she did not have notice of roach infestation of D-House." (Pl.'s Resp. at 9.) But such notice does not follow from the mere fact of regular exterminator visits.

### 9. Cynthia Harris

Defendant Cynthia Harris was a Correctional Counselor at Stateville during Sanchez's incarceration there. (Pl.'s Resp. Defs.' SOF ¶ 9.) Defendants concede that Harris was "the counselor responsible for responding to Plaintiff's grievances regarding the conditions" and that she responded to Sanchez's two grievances about the conditions in cell D-01-58. (Defs.' Mem. at 7.) They assert, however, that Harris's responses are insufficient to show deliberate indifference.

On September 11, 2018, Sanchez filed Grievance #6347, complaining about spiders, ants, and "hundreds of roaches" infesting his cell, D-01-58, and in his bed frame. (Pl.'s Ex. 37.) He also included a lengthy complaint alleging that another prison official had retaliated against him and "put [him] in danger" by disclosing his private information to another inmate and by placing him in D-House, where he had "enemies," instead of a different area of Stateville. (*Id.*) On February 8, 2019, Harris completed the "Counselor's Response" portion of the form, indicating that she had received the grievance on October 3, 2018. (*Id.*) She responded as follows in relevant part: "[I]nmate was moved to cell D149 on 12/25/18. The unit is sprayed on a monthly basis (for bugs)." (*Id.*)

On December 8, 2018, Sanchez filed Grievance #7413, in which he complained about roaches infesting his television and CPAP machine in cell D-01-58. (Pl.'s Ex. 28.) On February 28, 2019, Harris completed the Counselor's Response section of the form, stating in pertinent part that the grievance had been received on February 9, 2019; "inmate is currently housed in cell

D149"; "[t]he units are exterminated on a monthly basis"; and that Sanchez could submit a request to the healthcare unit if he believed he needed medical attention or that his CPAP machine was not functioning. (*Id.*)

In response to Defendants' motion, Sanchez contends that the length of time between Harris's receipt of his first grievance and her written response is evidence of deliberate indifference. Sanchez was moved from cell D-01-58 about two and a half months after the first grievance was received, and Harris did not provide a written response to that grievance until four months after its receipt. Sanchez also cites his deposition testimony, in which he stated that he had conversations with Harris about "[his] cell, the roaches" when she came by his cell "twice a week or something like that" and "[e]very time she came by" he asked her, "[w]hat am I still doing in this cell, Ms. Harris?" (Sanchez Dep. at 191-92, 218.)

The evidence Sanchez cites is insufficient to permit an inference that Harris was deliberately indifferent to a substantial risk of serious harm to Sanchez as a result of the infestation. The grievance Harris received in early October 2018 primarily consisted of a lengthy complaint about the actions of another prison official; Sanchez mentioned the pest issue only briefly in conjunction with his request to be reassigned to another area of the prison because he believed he had "enemies" in D-House. Other than the few details set forth above, Sanchez did not specifically describe how often he saw the pests or the length or extent of the infestation, nor did he state how it affected him. He did not state that any pests had crawled on him or bitten him. He did not mention his CPAP machine. Furthermore, there is no evidence of what details Sanchez provided to Harris in their conversations about "his cell" and "the roaches." Most significantly, Sanchez was moved out of cell D-01-58 about two and a half months after Harris received Grievance #6347. That time span and the limited extent of Harris's knowledge do not permit an inference that Harris

20

was deliberately indifferent to a serious risk of harm to Sanchez. A two- to three-month infestation does not approach the kind of prolonged or severe infestation that the Seventh Circuit has recognized as a deprivation sufficient for a constitutional violation. *See Smith*, 803 F.3d at 312-13 (citing cases); *Munson*, 2022 WL 17844068, at *2. Sanchez presents no evidence that Harris knew about the infestation in the next cell, D-01-49, so the fact that she did not provide a formal written response to Grievance #6347 until a month and a half after the reassignment (the relief Sanchez had sought) does not suggest deliberate indifference, especially in light of her notation that D-House was sprayed for insects on a monthly basis.

### 10.    Karen Rabideau

Defendant Karen Rabideau was a Placement Officer at Stateville at the relevant time. (Pl.'s Resp. Defs.' SOF ¶ 18.) Sanchez testified that he "told [Rabideau] to move me [out of cell D-01-58]. She ain't listen to me. I told her like 60,000 times. You got to move me, lady." (Sanchez Dep. at 46.) Sanchez further stated that he talked to Rabideau in an attempt "[t]o move [his] cell assignment away from the shower because that cell was infested with roaches" and that there were "plenty of complaints prior to [him] moving into that cell from other inmates that were there before me." (*Id.* at 47.) But Sanchez submits none of those prior complaints and no evidence of when he spoke to Rabideau or what he told her about the infestation, other than his belief that the nearby showers were attracting the pests. (*Id.* at 49.) Accordingly, Sanchez fails to establish a genuine issue of fact as to whether Rabideau was aware of a substantial risk of impending harm to him as a result of the conditions in cell D-01-58.

### 11.    Frederick Lang

The final Defendant named in Count I is Frederick Lang, who was a Correctional Lieutenant at Stateville at the relevant time. (Pl.'s Resp. Defs.' SOF ¶ 15.) In response to

Defendants' motion, Sanchez points to his testimony that he spoke with Lang "[h]undreds" of times, "as it relate[d] to" the "infestation and CPAP . . . every single day till Randy Pfister moved [him]." (Sanchez Dep. at 221-23.) Sanchez does not present any evidence of the substance of his conversations with Lang other than his vague testimony that they were "related to" the infestation and CPAP. He therefore fails to raise a genuine issue of fact as to whether the content of his communications with Lang gave Lang sufficient notice to alert him to an excessive risk to Sanchez's health and safety.

## II.    Eighth Amendment Medical Claim (Count II)

Count II is a claim that prison officials were deliberately indifferent to Sanchez's medical needs by failing to provide him with the supplies he needed for his CPAP machine. (2d Am. Compl. at 25-26.) The Supreme Court has "established that prison officials impose wanton and unnecessary infliction of pain when they are deliberately indifferent to an inmate's serious medical needs." *Giles*, 914 F.3d at 1049 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Like a conditions-of-confinement claim, a claim for deliberate indifference to serious medical needs includes an objective and a subjective component. *Id.* The plaintiff must prove that he suffered from (1) an objectively serious medical deprivation to which (2) a prison official was deliberately indifferent. *Id.* To demonstrate deliberate indifference in this context, the plaintiff need not show that he was literally ignored, but he must show a state of mind akin to recklessness. *Id.*

Sanchez asserts this claim against the eleven IDOC Defendants mentioned above (the "Stateville Defendants") and four additional Defendants: Christopher McLaughlin, who was the Warden of Hill, (Pl.'s Resp. Defs' SOF ¶ 20); Mark Williams, who was the Assistant Warden of Programs at Hill, (*id.* ¶ 21); Jerri Friend, who was a Correctional Counselor at Hill, (*id.* ¶ 22) (collectively, the "Hill Defendants"); and Victor Calloway, who was the Warden of Danville, (*id.*

¶ 23). None of these fifteen Defendants are medical professionals. As Defendants point out, the Seventh Circuit has "long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles*, 914 F.3d at 1049; *Johnson v. Prentice*, 29 F.4th 895, 905 (7th Cir. 2022). If a prisoner is under the care of medical experts, as was Sanchez at each facility, (Mem. Op. & Order of June 28, 2023 at 5-7), "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *See Giles*, 914 F.3d at 1049. "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 1049-50 (citation and internal punctuation omitted).

Defendants argue that even if it is assumed that the failure to provide Sanchez with replacement CPAP parts and the liquid soap he requested could be deemed a serious medical need, Sanchez cannot demonstrate that the Defendants were responsible for ordering medical supplies for inmates or had reason to believe that prison medical staff were mistreating or not treating him. They point out that at Hill and Danville, medical supplies were requested through medical professionals, who then ordered them, and at Stateville, where Sanchez concedes that he did receive various CPAP supplies, such supplies were ordered through medical professionals or through the responsible IDOC employee, a correctional supply supervisor who is not a defendant in this action. (Defs.' Mem. at 12-13.)

In response, Sanchez offers the following argument: "This Court, as it noted in its Order regarding Wexford's Motion to Dismiss, already found that 'at Stateville an IDOC employee was responsible for ordering supplies without Wexford's involvement.' Clearly IDOC is the liable

party at Stateville and IDOC was the gatekeeper and supervisors of those gatekeepers for actually providing medical supplies. Plaintiff's argument is that each of these Defendants knew he needed the supplies and purposely remained ignorant of Plaintiff's medical needs and chose not to act." (Pl.'s Resp. at 12 (citation omitted).)

Sanchez does not address the undisputed fact that at Hill and Danville, medical supplies were provided by medical professionals under Wexford's purview, and he points to no evidence from which it could be reasonably inferred that the Hill Defendants or Calloway had reason to believe that the medical professionals at Hill or Danville were mistreating or failing to treat him. Sanchez contends that he "spoke with Defendant McLaughlin once in person about his lack of medical care." (Pl.'s Resp. at 13.) What Sanchez actually said at his deposition was that he spoke with McLaughlin one time and told McLaughlin, "I'm going to sue your ass. . . . That's it. I'm going to see you in court. . . . That's what I said." (Sanchez Dep. at 237-38.) Sanchez believed that McLaughlin understood the reference because McLaughlin replied that they could resolve the matter because he had told a medical professional to order supplies and that they were going to arrive. (*Id.* at 238-39.) But Sanchez added that he was transferred out of Hill and to Danville "like a week" after that conversation, so this evidence does not permit an inference that McLaughlin had knowledge of any delay in the receipt of supplies and was deliberately indifferent.

Sanchez also fails to raise a genuine issue as to whether Mark Williams had actual knowledge of a problem with obtaining CPAP supplies. Sanchez points only to his vague testimony that he spoke to Mark Williams on one occasion and "[t]old him the same thing I told the other one, McLaughlin." (*Id.* at 241.) When Sanchez was asked what he remembered saying to Mark Williams, he did not say that he informed him about his need for CPAP supplies. Rather, Sanchez testified that he told Mark Williams that "I was going to sue his ass [and] . . . I was going

to have him working in the country, the farm, no more warden when I get through with you." (*Id.* at 242.)

As for Jerri Friend and Victor Calloway, Sanchez fails to point to any evidence that he told these Defendants anything in particular about his CPAP machine or a need for supplies. Sanchez gave no specifics about what he communicated to Friend. (*Id.* at 246 ("I would talk to her one on one and tell her. She was like, yeah, I'm going to help you out.").) And Sanchez's testimony about Calloway is sheer speculation that "he knew what was going on." (*Id.* at 248.)

As to the Stateville Defendants, Sanchez fails to develop his conclusory argument that "each of [them] knew he needed the supplies and purposely remained ignorant of" his medical needs. (Pl.'s Resp. at 12.) Deliberate indifference is a subjective standard, so each Defendant's knowledge and actions must be examined individually. An individualized analysis of the content and timing of Sanchez's communications with each Defendant about CPAP supplies is especially important with respect to the Stateville Defendants because it is undisputed that while Sanchez was at that facility, an IDOC employee gave him soap and replacement CPAP filters on several occasions throughout his incarceration, as well as a replacement CPAP mask. Sanchez does not discuss the Stateville Defendants individually. Rather, he contends that the supplies he received were "often not compatible with his CPAP machine or useful," (Pl.'s Resp. at 11-12), but that

argument overstates the evidence.[7]   In any event, Sanchez does not connect the alleged lack of supplies to any particular Stateville Defendant by explaining what each Defendant knew about the problem or why such knowledge can be reasonably inferred.  "[I]t is not [the] court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver."  *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) (citation and internal punctuation omitted); *see also Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011).  Sanchez does not present evidence from which it could be inferred that any Stateville Defendant was deliberately indifferent to his medical needs.

Sanchez also raises a perfunctory argument that "[d]ue to the lack of any policies or procedures, IDOC personnel refused to address" his need for medical equipment and supplies. (Pl.'s Resp. at 13-14.)  In our earlier opinion, we discussed what is required of a plaintiff when he is attempting to demonstrate that an entity's failure to implement policies or procedures constituted deliberate indifference: evidence tending to show that the entity made a "conscious decision not to take action."  (Mem. Op. & Order of June 28, 2023 at 15 (citing *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017).)  Sanchez has presented no such evidence, and the argument is waived as wholly undeveloped.   *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016)

---

[7]      In early October 2018, Sanchez signed a receipt for CPAP tubing.  (Pl.'s Ex. 30; Sanchez Dep. at 145.)  The receipt does not indicate that he received other supplies at that time.  On the receipt, Sanchez wrote, "too small, wrong filters!"  (Pl.'s Ex. 30.)  He testified that "I wrote right there, too small, wrong filters," and that he received the tubing but did not use it.  (Sanchez Dep. at 145.)  Although Sanchez maintains in his statement of additional facts that the receipt "shows that a mask that was obtained for him was too small," (Pl.'s SOAF ¶ 34), there is no indication on the receipt or from Sanchez's testimony that Sanchez's notation referred to a mask rather than tubing.  None of the other receipts that Sanchez signed for CPAP supplies in November 2018, early January 2019, mid-January 2019, March 2019, or May 2019 contains any indication that the supplies were not compatible with his machine or not "useful," (Pl.'s Exs. 31-35), nor is there other evidence to that effect.

("[P]erfunctory and undeveloped arguments . . . are waived (even where those arguments raise constitutional issues).").

In light of our conclusion as to Count II, we need not address the IDOC Defendants' argument that they are entitled to qualified immunity on this claim.

## III.    ADA Claim (Count III)

In Count III, Sanchez alleges that in failing to provide him with adequate equipment and supplies for his CPAP machine, the IDOC Defendants failed to reasonably accommodate and intentionally discriminated against him on the basis of his disability in violation of the ADA. (2d Am. Compl. at 26-30.) To succeed on this claim, one of the showings Sanchez must make is that he is a qualified individual with a disability. *See Bowers v. Dart*, 1 F.4th 513, 519 (7th Cir. 2021); *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 802 (7th Cir. 2023). Sanchez claims that his sleep apnea substantially limited the major life activities of sleeping and breathing. (2d Am. Compl. ¶ 123; Pl.'s Resp. at 14.)

The IDOC Defendants contend that there is no evidence to support a finding that Sanchez's sleep apnea constituted a substantial limitation on his major life activities at the relevant time such that he was disabled within the meaning of the ADA. They point out that Sanchez admitted that he used his CPAP machine throughout his incarceration and that he had no difficulty sleeping when he used it. (Sanchez Dep. at 33-34, 144.)

In his response to Defendants' relevant statement of fact, Sanchez says that Defendants "take[] out of context" his statement that his sleep was "all right" when he used his CPAP machine,

27

(Sanchez Dep. at 144), and refers to the length of his deposition, evidently implying that he was tired when he so testified. (Pl.'s Resp. Defs.' SOF ¶ 46.) But Sanchez made the statement before the deposition was even to the halfway mark, and his testimony does not reflect confusion or fatigue. Sanchez also disputes that the statement "fairly and accurately reflects the sum total of his testimony on pages 142-143 and elsewhere in that deposition." (*Id.*) Sanchez does not elaborate as to why the statement does not accurately reflect his entire testimony, and we reject the argument. If anything, the context bolsters Defendants' argument; Sanchez acknowledged that he repeatedly told prison medical staff throughout the relevant time that his sleep was "okay" or "good" or that he was "sleeping well." (Sanchez Dep. at 132-34, 138-44.)[8] Sanchez also acknowledged that he used prescription sleep medication "[e]very night" at each of the three IDOC facilities and that it was effective in helping him go to sleep. (Sanchez Dep. at 143 ("It knocks you out.").) Later in his deposition, when Sanchez was asked about how his sleep apnea affected his daily activities, he responded only with generalities that it just "makes you more tired" and "a little weak" while working out or running. (*Id.* at 290-92.)

Sanchez further asserts that Defendants "fail[] to look at the broader picture," (Pl.'s Resp. at 15), but he does not develop this argument by describing that picture, discussing or citing to any evidence that supports his claim that he is disabled under the ADA, or engaging with Defendants' argument that he has failed to provide any detail as to the nature of his sleep apnea or how it may have limited his major life activities while in prison. The decisions Sanchez cites for the proposition that sleep apnea is a disability are distinguishable because they were decided at the pleadings stage and involved claims that plaintiffs were altogether denied access to a CPAP

---

[8] There is just one exception to this pattern; Sanchez stated that in December 2018, he had reported to medical staff that anxiety was causing him not to sleep well. (Sanchez Dep. at 133.)

machine. (*Id.* at 5 (citing *Smith v. Dart*, No. 20 C 1381, 2020 WL 7260802 (N.D. Ill. Dec. 10, 2020) (with related cases 20 C 1459 and 20 C 2629).)

Although substantial limitation is "not meant to be a demanding standard" and an impairment need not "prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting," a plaintiff seeking to avoid summary judgment must nonetheless submit evidence from which a reasonable jury could find that at the relevant time, he was substantially limited in a major life activity and thus disabled. *Frazier-Hill*, 75 F.4th at 803-05. Sanchez does not do so. He merely argues generally that "sleep apnea is a disability under the ADA as it affects major life activities: sleeping and breathing," (Pl.'s Resp. at 14), but fails to present evidence that the limitation caused by *his* sleep apnea was substantial in terms of his *own experience*. The only evidence in the record is that it was insubstantial. Accordingly, summary judgment in the IDOC Defendants' favor on Count III is warranted.

Given that we are ruling in favor of the Defendants on the grounds discussed above, there is no need to reach Defendants' argument regarding liability in an official capacity.

## CONCLUSION

For the foregoing reasons, we grant the IDOC Defendants' motion for summary judgment [169]. Judgment will be entered in favor of Defendants Rob Jeffreys, Randy Pfister, Sherry Benton, Nicholas Lamb, Colleen Franklin, Kelly Ledford, Darwin Williams, Sherwin Miles, Cynthia Harris, Karen Rabideau, Frederick Lang, Christopher McLaughlin, Mark Williams, Jerri Friend, and Victor Calloway and against Plaintiff Eddie Sanchez on Counts I, II, and III of the

Second Amended Complaint. There being no remaining claims for adjudication, this case is terminated.

It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: October 10, 2023